Brian J. Stibitz
Kevin M. Boots
REEVES AMODIO LLC
500 L Street, Suite 300
Anchorage, Alaska 99501
Telephone:  (907) 222-7100
Facsimile:  (907) 22-7199
brian@reevesamodio.com
kevin@reevesamodio.com

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| LAURA O. RUSSELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| NORTH SLOPE BOROUGH, | ) | |
| HARRY BROWER, FOREST | ) | |
| OLEMAUN, FELIPE FARLEY, | ) | |
| SCOTT DANNER and KENNETH | ) | 3:20-cv-00058-RRB |
| ROBBINS, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MOTION AND MEMORANDUM TO DISMISS

Defendants North Slope Borough ("the Borough"), Harry Brower ("Brower"), Forest Olemaun ("Olemaun"), Felipe Farley ("Farley"), Scott Danner ("Danner") and Kenneth Robbins ("Robbins")(collectively these parties are referred to as "the Defendants") move to dismiss the above captioned action pursuant to Federal Rule of Civil Procedure 12(b)(3). Plaintiff Laura Russell ("Russell" or "Plaintiff") has filed suit in this court making numerous claims regarding employment discrimination and/or harassment against Defendants.  The allegations in Russell's complaint arise from Russell's employment with the Borough as an assistant borough attorney in Utqiagvik, Alaska, 720 miles north of Anchorage.  Russell's choice of federal court in Anchorage

Case 3:20-cv-00058-RRB   Document 13   Filed 09/14/20   Page 1 of 52

as the forum to adjudicate her claims presents enormous logistical challenges and costs. Moreover, Utqiavgik has a strong community interest in the litigation of her allegations – an interest not shared by Anchorage residents. Given that an adequate alternative forum exists in the Alaska Superior Court in Utqiagvik, and the private and public interest factors all weigh heavily in favor of litigation in Utqiagvik, this court should dismiss Russell's suit under the doctrine of *forum non conveniens*.[1]

## I. Facts

Russell has brought multiple claims against Defendants, including claims for alleged discrimination and retaliatory termination.[2] While Russell's factual allegations are false, it is important to note that every factual allegation made by Russell is alleged to have occurred in Utqiagvik.[3]

At trial, Defendants will defend against Russell's unfounded claims by demonstrating that she was terminated for serious lapses in professional judgment, violations of the Alaska Rules of Professional Conduct, misuse of her position as Assistant Borough Attorney and the office of the Chief of Police, and for interfering, contrary to North Slope Borough Code, in the hiring processes of the NSB Police Department that involved her sister. All witnesses and evidence concerning these matters are located in Utqiagvik.

### a. Witnesses in Utqiagvik Will Testify Regarding Russell's Relationship with the Former Police Chief Travis Welch

One issue that will be determined at trial will be the nature of Russell's relationship with the former Police Chief, Travis Welch. Defendants and other witnesses employed by the Borough

---

[1] The Defendants waive a statute of limitations defense should the court dismiss this matter and Russell refile in Utqiagvik Superior Court.

[2] *See*, First Amended Complaint, at ¶¶49-72.

[3] *Id.*, at ¶¶1-49.

(including current and former employees of the Police Department) will testify that Russell formed a close relationship with Police Chief Welch and spent a substantial amount of time with him. These witnesses will testify that Police Chief Welch's vehicle was often located at Russell's abode after work hours, in the evenings, and on weekends.[4] Police Chief Welch had such a favored status with Russell that she kept a reserved seat for him in her office at the Borough Law Department.[5] Russell and Police Chief Welch prepared a document by which the Borough Police Department deputized Russell, purporting to create a new position, the "office of Police Lawyer" and which gave her "arrest powers" and authorizations for "use of force at the direction of Chief Welch."[6]

Russell's relationship with Police Chief Welch was such that it drew the ire of his wife at the time, Kandace Welch, who had five children with the Police Chief. Russell filed for a restraining order against Kandace Welch.[7] From these pleadings, it is clear that Kandace Welch deemed Russell responsible for "stealing her man."[8] Russell accused Kandace Welch of anonymously leaving poisoned banana bread at her doorstep "with intentions to punish me."[9]

Russell's relationship with Police Chief Welch was problematic for the Borough and contributed to its decision to terminate her employment. One of Russell's job duties as an Assistant Borough Attorney was to advise the Borough Police Department concerning personnel matters, and their relationship created at a minimum the appearance of a conflict of interest. As noted in Russell's own complaint, "[w]hen a disgruntled police officer filed a grievance against the Chief

---

[4] *See*, Affidavit of Brian J. Stibitz, at ¶2.
[5] *See*, Exhibit 1, Chair Photo.
[6] *See*, Exhibit 2, Oath of Office.
[7] *See*, Exhibit 3, Motion for Restraining Order.
[8] *Id*.
[9] *Id*.

of Police, the disgruntled employee included in his grievance the false suggestion that Plaintiff and the Chief of Police were engaged in a sexual relationship."[10]

At trial, the nature of Russell's relationship with Police Chief Welch will be a primary issue. If such a relationship existed, it would be a violation of Rule 1.8 of the Alaska Rules of Professional Conduct, and one of many reasons that Russell's termination was justified. None of the witnesses with knowledge of this issue are located in Anchorage, and all are located in Utqiagvik.

   b. *Witnesses in Utqiagvik Will Testify Regarding Russell's Abuse of Her Position and the Office of the Police Chief*

Russell is a foster parent. Russell wanted her foster child to be placed into the Barrow Early Learning Center (BELC), an educational and care providing facility administered by the Borough, which has limited availability. On September 8, 2017, Russell was advised by the BELC Supervisor that there was no longer space available at BELC for her foster child.[11] After being told there was no space at BELC for her foster child, Russell travelled to BELC's offices in a police car with Police Chief Welch and an Office of Children's Services (OCS) worker to question why her foster child did not have a placement in the program.[12]

Russell, Police Chief Welch and the OCS worker asked the BELC supervisor to call the family that had filled the last remaining slot in the BELC program, and advise the family that the placement of their child had been a mistake, thereby creating an opening for Russell's foster child.[13] The BELC supervisor refused to take this action, as doing so went against BELC's first

---

[10] *See*, First Amended Complaint, at ¶26.
[11] *See*, Exhibit 4, March 7, 2018 E-mail from Nicole Watson.
[12] *Id.*
[13] *Id.*

Case 3:20-cv-00058-RRB   Document 13   Filed 09/14/20   Page 4 of 52

come, first served policy.[14] Russell, Police Chief Welch and the OCS worker told the BELC supervisor that they would contact her supervisor, the Health Department Director, to force her to take the requested action.[15] Although the Health Department Director was not contacted, the BELC supervisor nonetheless arranged for Russell's foster child to attend the program part-time.[16] The BELC supervisor's account of the incident has been confirmed by another NSB employee.[17]

Russell's abuse of her office and that of the Police Chief, to intimidate BELC employees into creating a space for her foster child, was another issue which led to her termination. Vasha Davis and Nicole Watson, who will testify regarding this incident, are located in Utqiagvik.

Russell continued to abuse her position and that of Police Chief Welch, and took further actions that led to her termination. A foster child was placed with Russell pursuant to a program administered by the Native Village of Barrow Tribal Court. A prior foster parent of the child was receiving benefit checks through a program administered by Arctic Women in Crisis (AWIC). Russell claimed entitlement to the checks issued by AWIC to the previous foster parent, and used her relationship with Police Chief Welch to subvert standard police protocol and the due process requirements afforded to the previous foster parent of the child.[18]

According to a memorandum filed by the Acting Police Lieutenant, a police "agency assist" was performed at the request of Police Chief Welch, during which benefit checks were obtained by the police from the previous foster parent, and given to Russell.[19] According to the memorandum, the police department had never before performed an agency assist on account of

---

[14] *Id.*

[15] *Id.*

[16] *Id.*

[17] *See*, Exhibit 5, March 7, 2018 E-mail from Vasha Davis. It is evident from this e-mail that the BELC employees felt intimidated by Police Chief Welch's presence.

[18] *See*, Exhibit 6, March 8, 2018 Memorandum by Scott Sharpe.

[19] *Id.*

Case 3:20-cv-00058-RRB   Document 13   Filed 09/14/20   Page 5 of 52

alleged welfare fraud.[20] The protocol for recovering such checks, if they were in fact fraudulently obtained, would be to refer the matter to AWIC, at which time AWIC would decide whether to file a complaint.[21] If AWIC filed a complaint, the police would then perform an investigation to determine whether criminal charges were appropriate.[22] None of these protocols were followed, and Russell was able to obtain the benefit checks without affording the prior foster parent due process. Moreover, the NSB police "shortcut the evidence processing procedure and released the benefit checks" so that Russell could obtain the checks prior to her flight on March 4, 2018.[23] Russell was terminated days after this event. Evidence and witnesses relating to this incident, which contributed to the Borough's decision to terminate Russell, are located in Utqiagvik.

### c. Utqiagvik Witnesses Will Testify that Russell Violated Borough Code By Intervening in the Hiring Process Involving Her Sister

The record establishes that both Russell and Police Chief Welch intervened in the hiring process on behalf of Beth Russell, who had applied for a job within the police department. Russell's sister, Beth Russell, applied for the position as a police dispatcher at the NSB Police Department. According to Beth Russell, she applied for the position in December 2017, and was subsequently interviewed on February 9, 2018.[24]

Belinda Glastetter, the Police Dispatch Supervisor, was the hiring manager responsible for conducting interviews on behalf of the Police Department. Ms. Glastetter was approached by Police Chief Welch, who recommended that she hire Beth Russell for the dispatcher position.[25]

---

[20] *Id.*

[21] *Id.*

[22] *Id.*

[23] *Id.* Perhaps not coincidentally, Russell travelled to Anchorage on March 4, 2018 to attend a conference that was also attended by Police Chief Welch.

[24] *See*, Exhibit 7, Beth Russell ASCHR Complaint. Contrary to the allegations in Beth Russell's complaint, the NSB Police Department had not refused to accept Beth Russell's application. To the contrary, as of March 8, 2018, the Department was still considering her application.

[25] *See*, Exhibit 8, March 8, 2018 Memorandum by Belinda Glastetter.

Case 3:20-cv-00058-RRB   Document 13   Filed 09/14/20   Page 6 of 52

Ms. Glastetter was upset that Police Chief Welch attempted to influence her hiring decision and conveyed this sentiment to the acting Deputy Police Chief.[26]

Russell had a legal duty to refrain from attempting to influence the Borough Police Department's hiring process involving her sister, as doing so created a conflict of interest. NSB Code § 2.22.035 states:

> *Substantial financial or private interest.* A Borough employee shall not participate in an official action in which the employee or a member of the employee's immediate family has a substantial financial or private interest. A Borough employee shall disclose in narrative form to the designated ethics officer, the employee's financial or private interest in official action and the financial or private interest of any member of the employee's immediate family as defined in 2.22.140, if the employee's duties could influence the official action.

As noted, it was no secret in Utqiagvik that Russell and Police Chief Welch had a close relationship. Russell's or Welch's interference in the hiring process subjected the police department to claims of favoritism/nepotism, and exposure to potential liability to other qualified applicants.

Despite her ethical and legal duties, Russell did not refrain from attempting to influence the hiring process involving her sister. According to Russell, she contacted Ken Robbins on multiple occasions regarding the hire of her sister Beth Russell.[27] While the NSB had not yet even filled the position of dispatcher, or made a decision on whether to hire Beth Russell, Laura Russell accused the police department of discriminatory hiring practices, presumably to pressure the

---

[26] *Id.*

[27] *See*, Exhibit 9, March 6, 2018 E-mail from Laura Russell to Felipe Farley, Deano Olemaun and Harry Brower. "I have attempted multiple times to speak with Ken Robbins about these issues but he has refused to talk to me on an timely basis…"

department into hiring her sister.[28] On March 6, 2018, Russell sent an e-mail to Borough Attorney Felipe Farley, former Borough Chief Administrative Officer (CAO) Deano Olemaun, and Borough Mayor Harry Brower.[29] In the e-mail, Russell notified the Borough that she had initiated a complaint on behalf of her sister and against the Borough before the Alaska State Commission for Human Rights (ASCHR).[30] In the e-mail, she stated that she "notified the Commission that Director Leavitt has illegally discriminated and retaliated in the hiring process involving [her] sister Beth Russell (who was interviewed with both NSBPD and A&F.)"[31] The record indicates that Beth Russell filed a complaint with ASCHR on March 7, 2018.[32] However, as of March 7, 2018, the NSB still had not filled the position of police dispatcher, and had not ruled out Beth Russell as a candidate.[33] On March 7, 2018, Ms. Russell was terminated by the NSB.[34]

> ### d. Utqiagvik Witnesses Will Testify Russell Assisted Her Sister, and Others, In Making Legal Claims Against Her Own Client

On March 7, 2018, Laura Russell assisted her sister Beth Russell in filing a complaint against her own client, the Borough, before ASCHR. [35] Regardless of the merits of Russell's allegations about discrimination in the police department hiring process (which are false), Russell's self-proclaimed actions were breach of her ethical duties to her client. As an Assistant Borough Attorney, Russell represented the Borough, and the Police Department in particular, in

---

[28] Id.

[29] Id.

[30] Id.

[31] Id.

[32] See, Exhibit 7, Beth Russell ASCHR Complaint.

[33] See, Exhibit 8, March 8, 2018 Memorandum by Belinda Glastetter.

[34] That same day, Ms. Russell made a Facebook post regarding her termination. In the Facebook post, she stated she was fired because "I refused to endorse discriminatory practices, I refused to help the Borough cover up a terrible crime, and then I committed the ultimate sin of reporting sexual harassment and gender discrimination." See, Exhibit 10, Laura Russell March 7, 2018 Facebook Post. Ms. Russell's public allegations (against her own client) clearly are not supported by the facts, as the Police Department had not even filled the dispatcher position at that juncture.

[35] See, Exhibit 9, Beth Russell ASCHR Complaint.

an attorney-client capacity. Russell, while representing the Borough, assisted her sister in filing an ASCHR complaint against her own client. There is no question she was engaged in a conflict of interest expressly prohibited by Alaska Rule of Professional Conduct 1.7(a).[36]

Not only did she represent her sister in filing a complaint against her own client before ASCHR, she also contacted other Borough employees and encouraged them to file complaints against her own client. Russell, while employed as an attorney for the Borough, contacted a former Borough employee, Christine Hildebrand, in order to persuade and assist her in filing a grievance against the Borough.[37] According to Ms. Hildebrand, Ms. Russell called her on her cell phone on March 7, 2018, despite the fact that Ms. Hildebrand and Ms. Russell are not close acquaintances.[38] Ms. Russell told Ms. Hildebrand that she should file a complaint against the Borough before ASCHR.[39]

Russell also contacted James "Hina" Kilioni and offered to assist him in filing a complaint against the NSB before the ASCHR.[40] To the extent that Ms. Russell, while representing the NSB, advised Mr. Kilioni to file a complaint against the NSB before ASCHR, she was engaged in a conflict of interest prohibited by Alaska Rule of Professional Conduct 1.7(a). Evidence and witnesses relating to these incidents, which contributed to the Borough's decision to terminate Russell, are located in Utqiagvik.

---

[36] Rule 1.7(a) states: "a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if: the representation of one client will be directly adverse to another client."
[37] *See*, Affidavit of Brian J. Stibitz.
[38] *Id.*
[39] *Id.*
[40] *Id.*

*e. Utqiagvik Witnesses Will Testify Regarding the Work Environment at the Borough*

Much of Russell's Amended Complaint make allegations concerning the work environment at the Borough.[41] To disprove Russell's allegations, the Borough will call over a dozen employees from the Borough to describe the work environment at the Borough. Moreover, in a letter from Russell's prior counsel, Russell named 14 individuals residing in Utqiagvik that she claims are "known to have engaged in defamatory, retaliatory and harassing behavior towards and about Ms. Russell…"[42] The Borough expects these witnesses to testify at trial as well.

## II.    Argument

A party seeking dismissal on the grounds of *forum non conveniens* must demonstrate two things:  First, that an adequate alternative forum exists; second, that that the balance of "private and public factors" favors dismissal.[43] As discussed below, an adequate alternative forum clearly exists in the form of the Alaska Superior Court in Utqiagvik.  Although it is "rare," a federal court may dismiss a case under the doctrine of *forum non conveniens* in order for the case to be heard in a more convenient state court.[44] Russell's case, filed in Anchorage federal court, 720 miles away from Utqiagvik, the site of all her claims, presents exactly this rare situation.

Utqiagvik Superior Court is a court of general jurisdiction[45] and may hear the questions presented in Russell's suit.  Moreover, the remedies Russell seeks are available in Alaska Superior Court.  The private and public factors test strongly favors dismissal because Russell's allegations all stem from events which took place in Utqiagvik, all evidence related to the case, whether

---

[41] *See*, Amended Complaint, at ¶¶1-49.
[42] Exhibit 11, April 13, 2018 letter from Sarah Bloom to Harry Brower and Felipe Farley.
[43] *Loya v. Starwood Hotels & Resorts Worldwide, Inc*., 583 F.3d 656, 664 (9th Cir. 2009).
[44] *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.,* 549 U.S. 422, 430, (2007)
[45] AS 22.10.020.

documentary or testimonial is in Utqiagvik. Jury duty would be imposed on Anchorage residents, whose community has no relation to the litigation. Finally, the community of Utqiagvik has a strong interest in the outcome of litigation involving serious allegations against its local government (an interest that Anchorage residents do not share). There is simply no reason this case should be litigated in the U.S. District Court in Anchorage and every part of the analysis means the case should be dismissed pursuant to *forum non conveniens* and heard in Utqiagvik.

a. *An Adequate Alternative Forum Exists in Utqiagvik.*

The first question in any *forum non conveniens* analysis is whether an adequate alternative forum exists. In conducting this analysis, the "key determination" is whether "the remedy provided by the alternative forum is so clearly inadequate or unsatisfactory that it is no remedy at all."[46] Although the moving party bears the burden of demonstrating that an alternative forum exists, the plaintiff's choice of their home forum should not be given "dispositive weight."[47] Instead, "if the balance of conveniences suggests that trial in the chosen forum would be unnecessarily burdensome for the defendant or the court, dismissal is proper."[48]

In the instant case, an adequate alternative forum clearly exists in the form of the Alaska Superior Court in Utqiagvik. Russell's complaint raises no legal questions which cannot be decided by that court as a court of general jurisdiction.[49] Moreover, Russell is an Alaska resident, as are the Defendants[50] and are therefore subject to the jurisdiction of Alaska state courts. Since Russell and Defendants are all citizens of Alaska and subject to the jurisdiction of its state courts

---

[46] *Creative Tech., Ltd. v. Aztech Systems Pte., Ltd.*, 61 F.3d 696, 701 (9th Cir. 1995) quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 256 (1981).
[47] *Piper Aircraft Co. v. Reyno*, 454 at 266 (internal citations omitted).
[48] *Id.*
[49] AS 22.10.020(a).
[50] *See*, First Amended Complaint, ¶¶4-10.

there is no question of diversity of citizenship.[51]  Finally, Russell requests damages, including

punitive damages, attorney fees and costs, and other "just and proper" relief.[52]  The relief Russell

requests is all available to her in Alaska Superior Court.  In sum, the Alaska Superior Court has

the jurisdictional power to hear Russell's claims.  Moreover, it is capable of granting the relief

Russell requests.  The Alaska Superior Court in Uqtiagvik is clearly an "adequate forum" for

litigating Russell's claims, given that the "key determination" is whether the alternative forum

provides adequate remedies to Russell.   Other than Russell's physical presence in the city, there

is no justifiable reason for litigation in this case to take place in Anchorage.

> b.  *The Balance of Private and Public Factors Heavily Favors Dismissal.*

The second part of a *forum non conveniens* analysis turns on whether "the balance of

private and public interests favors dismissal."[53]  These factors all weigh in favor of the dismissal

so the case can be tried in Utqiagvik.

> i.  *The Private Interest Factors All Weigh in Favor of Dismissal.*

The private interest factors include:

"(1) relative ease of access to sources of proof; (2) the availability of compulsory process
for attendance of unwilling witnesses, and cost of obtaining attendance of willing
witnesses; (3) possibility of viewing subject premises; (4) all other factors that render trial
of the case expeditious and inexpensive."[54]

Each of these factors weighs in favor of dismissal under *forum non conveniens*. All the

evidence, testimonial, documentary and otherwise, is in Utqiagvik.  Other than Russell herself,

none of the relevant witnesses resides in Anchorage.  Approximately 20 witnesses, 15 of which

---

[51] 28 USC § 1332(a)(1).

[52] *See*, First Amended Complaint at p.16.

[53] *Loya*, supra, at 664.

[54] *Creative Tech., Ltd. v. Aztech System Pte.*, Ltd., 61 F.3d 696, 703 (9th Cir. 1995).

MOTION TO DISMISS
*RUSSELL v. NORTH SLOPE BOROUGH, ET AL*
3:20-CV-00058-RRB

Case 3:20-cv-00058-RRB   Document 13   Filed 09/14/20   Page 12 of 52

are the Borough's staff, would need to be flown from Utqiagvik to Anchorage because Russell's case is based almost entirely on allegations stemming from her workplace environment with the Borough.[55] Moreover, none of the documentary evidence necessary to litigate this case is located in Anchorage. Documentary evidences such as Russell's employment records, correspondence and memoranda regarding her history with the Defendants is all in Utqiagvik. Foundational witnesses and records custodians are all in Utqiagvik. Both Russell and the Defendants would pointlessly spend their resources accessing the evidence for this case in Utqiagvik, and transporting it to Anchorage, limiting their respective abilities to effectively litigate this case. The first factor of the private interest test weighs in favor of a *forum non conveniens* dismissal so that this case may be litigated in Utqiagvik.

All witnesses other than Russell are in Utqiagvik or outside Anchorage. To the extent any are unwilling to testify – and it is very unlikely any are given the community interest in this case – service of process will be far less onerous for both sides if this case is litigated in the Utqiagvik Superior Court. No arrangements would have to be made for flights, food and lodging for nearly all of the witnesses to come to Anchorage. With respect to the third factor, all events Russell complains of took place in Utqiagvik, which favors dismissal under this factor as well. By any measure, the first three private interest factors favors litigation in Utqiagvik.

Finally, litigation in Utqiagvik would obviate the expense of flying witnesses to Anchorage. Again, all the witnesses involved in this litigation live in Utqiagvik or outside of Anchorage, and all would need to be flown to Anchorage for this litigation. Again, the remedies Russell requests could easily by obtained through the Alaska Superior Court in Utqiagvik. Litigation in Anchorage would be both very, and unnecessarily, expensive for all parties.

---

[55] *See, e.g.* Exhibit 12, which names 14 likely witnesses. The Borough anticipates even more will be necessary to establish its defenses.

MOTION TO DISMISS
*RUSSELL v. NORTH SLOPE BOROUGH, ET AL*
3:20-CV-00058-RRB

By the same token, litigation in Anchorage would be anything but expeditious. Witness travel would need to be arranged, scheduled, and coordinated with those of the attorneys for both parties. This coordination will cause unnecessary delays in the litigation, for no valid reason, and would be mitigated if this litigation takes place in Utqiagvik. The fourth private interest factor strongly favors dismissal.

The private interest factors clearly favor a *forum non conveniens* dismissal. The evidence underlying this litigation is entirely in Utqiagvik. The witnesses to Russell's allegations almost entirely reside in Utqiagvik. Russell was employed in Utqiagvik and no part of the underlying events took place in Anchorage. Lastly, the logistics of transporting all the witnesses to Anchorage for this litigation and the delay that would cause militate in strong favor of a *forum non conveniens* finding. Alaska Superior Court in Utqiagvik can provide Russell the remedies she seeks. There is no valid reason for this litigation to be heard in Anchorage. The private interest factors all strongly favor dismissal.

### ii. The public interest factors all favor dismissal

The public interest factors also all favor dismissal, to the extent each factor is applicable to the instant case. The public interest factors include:

> "(1) administrative difficulties flowing from court congestion; (2) imposition of jury duty on the people of a community that has no relation to the litigation; (3) local interest in having localized controversies decided at home; (4) the interest in having a diversity case tried in a forum familiar with the law that governs the action: (5) the avoidance of unnecessary problems in conflicts of law."[56]

First, court congestion and administrative difficulties are simply not a concern, should this case be litigated in Utqiagvik. Per the Alaska Court System, Utqiagvik Superior Court had a

---

[56] *Id.*, at 703-704.

total of 297 filings, or 1.3% of the total superior court case filings in the Alaska Court System.[57] In comparison, the Anchorage Superior Court had 10,977 filings, or 46.9% of Alaska superior court filings.[58]  Dismissal would not cause congestion or administrative difficulties, given that Utqiagvik Superior Court hears just over one percent of the total cases filed in Alaska superior court.

The second and third factors also strongly favor dismissal.  Russell's case implicates the most important and fundamental functions of the local government of Utqiagvik: its mayor, the leadership of its police department and law enforcement agencies, its legal department, and even its child welfare services.  The community has a strong interest in having this controversy litigated and decided in Utqiagvik given the questions Russell raises regarding the community's government.  The community of Anchorage, on the other hand, does not share this interest.  Its juries should not be burdened by litigation that has no relation to its community.  The community concerns and interest in the highly localized controversies at the heart of Russell's case do not exist for Anchorage juries.  These factors all strongly weigh in favor of dismissal and against the litigation of this matter in Anchorage.

The fourth and fifth factors also weigh in favor of dismissal, to the extent they apply at all. Unlike in *Piper*, this case would not be heard in a foreign court if dismissal is granted so conflicts of law concerns are not applicable.  Rather, Utqiagvik Superior Court is a competent court of general jurisdiction in the United States and is fully capable of adjudicating Russell's claims. These final factors are either non-applicable or weigh in favor of dismissal.  Like the private interest factors, each public interest factor weighs in favor of dismissal.

---

[57] "Alaska Court System Annual Report FY 2019," available online at https://public.courts.alaska.gov/web/admin/docs/fy19.pdf, at p.85 and accessed September 11, 2020.
[58] *Id.*

## III. Conclusion

There is no good or even valid reason for this case to be litigated in Anchorage and every reason for it to be heard in Utqiagvik. Utqiagvik Superior Court provides a more than adequate forum for this litigation. Every factor to be considered in a *forum non conveniens* analysis weighs in favor of dismissal so that this case may be heard in Utqiagvik. The court should grant the Defendants' motion so that this case may be heard in the community it directly affects, rather than in a community with no interest in it.

DATED at Anchorage, Alaska this 14th day of September, 2020

> REEVES AMODIO LLC Attorneys
> for Defendants
>
> /s/ Brian J. Stibitz
> AK Bar No.0196043
>
> /s/ Kevin Boots
> AK Bar No.0912090

Certificate of Service:

The undersigned certifies that the foregoing document was served via email through the ECF-system, on the following on this 14th day of September 2020.

Timothy W. Seaver
Seaver & Wagner, LLC
500 L Street, Suite 5001
Anchorage, AK 99501
tseaver@seaverwagner.com
gmichaelson@seaverwagner.com

Jonathon A. Katcher
Pope & Katcher
421 West 1st Avenue, Suite 220

MOTION TO DISMISS
*RUSSELL v. NORTH SLOPE BOROUGH, ET AL*
3:20-CV-00058-RRB

Anchorage, Alaska 990501
jakatcherak@gmail.com
salto@alaska.net


 /s/Tayler Haag
Legal Assistant

# EXHIBIT 1

EXHIBIT 1



# EXHIBIT 2

EXHIBIT 2

**NORTH SLOPE BOROUGH
POLICE DEPARTMENT**
P.O. Box 470
Barrow, Alaska 99723
Phone: 907-852-0311
Fax: 907-852-0318



**Travis Welch, Chief of Police**

# Oath of Office

I, Laura O'Neil Russell, do solemnly swear of affirm that I will be loyal to and uphold the Constitution of the United States of America, the State of Alaska and the Charter of the North slope Borough; and that I will faithfully and to the best of my ability perform the duties and responsibilities of the office of Police Lawyer; and that I will to the best of my abilities assist Chief Travis Beryl Welch and the Police Department accomplish their mission to provide the people of the North Slope Borough with the highest levels of police service. For this I am granted a very narrow scope of arrest powers and use of force at the direction of Chief Welch.

| | | |
|---|---|---|
| Printed Name | Signature | Date |

| | | |
|---|---|---|
| Travis B. Welch | Signature | Date |

# EXHIBIT 3

EXHIBIT 3

IN THE DISTRICT/SUPERIOR COURT FOR THE STATE OF ALASKA

AT

|  |  |
|---|---|
| **LAURA O'NEIL RUSSELL,** | ) |
| Petitioner          DOB: 4/20/1985 | ) |
| v. | ) CASE NO. _3AN-18-02768CI_ |
| **KANDACE MARIE WELCH,** | ) |
| Respondent     DOB: 7/19/1979 | ) **PETITION FOR** |
| Female | ) **STALKING** |
|  | ) **PROTECTIVE ORDER** |

My name is Laura O'neil Russell. I request the following orders to protect me from stalking by Kandace Marie Welch:

- **20 day, ex parte protective order**
  (If granted, a 20-day order can start immediately without first telling Kandace.)

- **6 month, long-term protective order**
  (If granted, a six month order can start after notice to Kandace and a court hearing. Kandace is entitled by law to 10 days' notice before the hearing can take place.)

I certify that I notified or tried to notify Kandace. I told her that if she contacted me again I would ask the court for a restraining order. She emailed me again the next day after I told her that.

## RELATIONSHIPS

Kandace is not my household member as defined in AS 18.66.990(5).

## DESCRIPTION OF THE STALKING

Kandace Welch stalked me. Kandace's conduct placed me in fear of:

- death or physical injury to me.

### Description of Kandace's conduct:

I have never met Kandace in person. She contacted me over Facebook Messenger late last year accusing me of trying to steal her man. I blocked her from social media and did not respond. She asked at least one person that we mutually know for my contact information so that she could continue to message me but they told her that I don't want contact with her. Despite that, she went by my home in Barrow on multiple occasions. On one occasion, she anonymously left banana bread on my doorstep with a handwritten note. She later told a mutual friend that she had done this even though I didn't want to talk to her. Around that time, I was told by a friend that Kandace

**This is Not a Court Order**

had cooked for him and he had become sick. I had not eaten the anonymous food, but I was afraid that she was trying to harm me by tricking me into eating something she had made with intentions to punish me. She has continued to contact my friends and professional acquaintances about me. I moved to Anchorage early this year. Since then I am certain she has continued to find out where I live and come by, because she has made comments to others about where I live and who visits me. She has continued to try to find me on social media. When she was unable to, she "hacked" into someone else's email to get my email address. Yesterday she forwarded me an email from the account she had hacked. She sent an extremely long email to me with a long list of all the things she thinks I am doing wrong and stated to another person copied in the email that "obviously she [Laura] is so scared of me she has to block me in every way." I responded and wrote, "Kandace, the fact that you know I have blocked you and you continue to contact me shows a frightening disregard for boundaries...At this point I am only responding to create a record fo the court. Do not contact me. Do not come to my home or place of work. Do not contact my friends or associates about me. If you do not take no for an answer and do any of the above, I will file with the court for a restraining order." Today she emailed me again saying "why are you so scared?" I am scared that she will try to harm me. She knows where I live and she has shown recently that she will find my house, come to it without my permission, and try to trick me into consuming things I don't know are from her. I know that she has apparently made at least one other person sick by "punishing" them with food she cooked. Even after I moved, she tracked down my new home and has been monitoring who visits me and when. I told her that her behavior is frightening and explicitly reaffirmed what she already knew - which is that I do not want her to contact me in any way. Despite that, and even with the threat of a restraining order, she immediately contacted me again. She shows no respect for rules of law or propriety and I am afraid of what she will do without someone else intervening. I am asking the court for a protective order to prevent her from contacting me again.

## CONTACT LIMITS REQUESTED

**I want the judge to order that Kandace not contact me in any way directly or indirectly.** Limited contact can be **safe** in these ways: No safe contact method provided.

## STAY AWAY ORDERS REQUESTED

**I want the judge to order Kandace to stay away from these places:**

- **My residence**

  Kandace does not live here.
  Kandace knows where I live.

- **My jobs**
  <u>Job 1</u>

  Kandace does not work here.
  Kandace does not know I work here.

CIV-752 PETITION FOR A STALKING PROTECTIVE ORDER

**This is Not a Court Order**

AS 18.65.850-.870/
Civil Rule 65.1

**OTHER REQUESTS**

- I want the judge to order Kandace not to follow, approach, confront, watch or stalk me in any other way or threaten to do so.

---

**OTHER CASES**

**Kandace's other cases in Alaska or anywhere else (that I know of):**
Don't know.

**My other cases in Alaska or anywhere else:**
None.

(NOTE: Both parties have the responsibility to tell the court of any criminal or civil lawsuits involving either of you that arise while a petition for protective order is pending. AS 18.65.865(d)

---

**CONTACT INFORMATION FOR KANDACE**

<u>Name</u>: Kandace Marie Welch

<u>Mailing address</u>:
1131 Lakeview Terrace
Fairbanks Alaska 99701

<u>Phone Numbers</u>:
Home: (907) 374-0722
Cell: (406) 479-4582

---

**CONTACT INFORMATION FOR ME**

<u>Name</u>: Laura O'neil Russell

<u>Mailing address</u>:


<u>Phone Numbers</u>:


I swear or affirm under penalty of perjury that all the information I provided in this petition is true to the best of my knowledge and belief.

_____  10/22/18
Date

_____
Petitioner's Signature

3 of 4
CIV-752 PETITION FOR A STALKING PROTECTIVE ORDER
**This is Not a Court Order**

AS 18.65.850-.870/
Civil Rule 65.1

Laura O'neil Russ      r. Kandace Marie Welch

_Laura Russell_
Print Name

Subscribed and sworn to or affirmed before me at _Anchorage_, Alaska on

_10/22/ 2018_.
(date)


(SEAL)

_____
Clerk of Court, Notary Public or other person
authorized to administer oaths.
My commission expires: _w/o Office_

**This is Not a Court Order**

IN THE DISTRICT/SUPERIOR COURT FOR THE STATE OF ALASKA
AT_____ANCHORAGE_____

LAURA RUSSELL
PETITIONER (protected person), ☐ M ☒ F
Birthdate: 04/20/1985
☐ Petitioner is a child. Who is signing for the child?
Name:_____
Relationship to child: _____ Birthdate: _____

v.

KANDANCE WELCH
RESPONDENT (restrained person), ☐ M ☒ F
Birthdate: 07/19/1979
☐ Respondent is a child. Who is signing for the child?
Name:_____
Relationship to child: _____ Birthdate: _____

Case No. ___3AN-18-02768___ CI

**REQUEST FOR SERVICE AND
PEACE OFFICER'S RETURN OF
SERVICE (ONE PETITIONER)**

Court Date: 11/06/2018
Court Fax_____

**Please immediately serve the following documents on respondent** ☒ **and** _____
The next court hearing is scheduled for 11/06/2018 @ 10:00 AM

☒ Petition for Protective Order(s)
☐ Emergency Protective Order (72 hours)
☐ 20-Day Ex Parte Protective Order
☐ Long-Term Domestic Violence Protective Order
☒ Stalking or SA Order (20 days)
☐ _____

☐ Reassignment Order
☐ Order Extending Ex Parte Protective Order
☐ Order on Petition for Protective Order(s)
☐ Notice of Hearing
☐ Stalking or SA Order (6 months)
☐ _____

A return of service must be filed with or faxed to the court at the number shown above before the hearing.

**RETURN OF SERVICE**

I certify that I:

☒ Served the document(s) listed above on respondent ☐ and _____
by handing to, and leaving a true and correct copy with ☐ him ☒ her ☐ them, personally, at
(address) _1131 LAKEVIEW TERRACE_
in __FAIRBANKS__, Alaska, on (date) _10/24/2018_ at _1324_ _P_.m.
☐ Turned custody of the minor child(ren) _____
over to

☐ Removed respondent from petitioner's residence located at _____
☒ Explained direct / indirect contact and communication to the person(s) served.
☒ Explained effective dates of the protective order (section B) to the person(s) served.
☐ Entered into DV Registry by DSN
☐ Did not serve the above-listed documents on the respondent named above because
_____
_____

_10/24/18_
Return Date

_____
Time Spent

Signature
_____ CSO
Print Name and Title

Distribution: 1. Original to law enforcement agency with jurisdiction where respondent is located.
2. Copy to court file.

AKI807663

DV-125 (4/12)(cs)
REQUEST FOR SERVICE AND PEACE OFFICER'S RETURN OF SERVICE (ONE PETITIONER)

# EXHIBIT 4

**EXHIBIT 4**

**Brian Stibitz**

| | |
|---|---|
| **From:** | Nicole Watson <Nicole.Watson@north-slope.org> |
| **Sent:** | Wednesday, March 7, 2018 7:41 PM |
| **To:** | Felipe J. Farley |
| **Cc:** | Rosemarie Habeich; Cheryl Humme |
| **Subject:** | Statement from the Sept. 8 incident |

Good Evening Felipe,

As per our conversation earlier, here is my statement from the incident that happened on September 8, 2017.

On September 8, 2017, I received a call from OCS asking if we had space available to enroll an infant. I informed them that I might have a slot available but that I have to check on the statues of that slot. I also informed them that as per our policy, I cannot guarantee the child's acceptance until the enrollment packet is complete. Unfortunately, as the day went on, another family turned in a complete enrollment packet and I had to give the available spot to them. It wasn't until later in the day that I received another call from OCS, they called to inform me that they just faxed over a portion of the enrollment packet but that they are still working on filling out the rest of the enrollment packet because they don't have the information needed to answer all the questions on the forms. I then notified them that we no longer have a spot available but that I can put the child on the waiting list as soon as the rest of the forms are complete. The person I spoke to on the phone then informed me that she will notify her supervisor. She then told me that her supervisor is on her way to the center to speak to me. When she arrived, she pulled up in a white SUV along with 2 other people. As they were walking up the stairs, I could see from my security camera that one of them was in a police uniform. They walked in to my office and they introduced themselves as, Vanessa, Barrow OSC supervisor, Laura Russell, Assistant Borough Attorney and Chef Welch. Vanessa did most of the talking, and she stressed the fact that they really need to get the child in the center and that I gave a spot away that should have been theirs. I informed them that I truly do understand the situation but that we cannot prioritize enrollment base on their cases, enrollment is based on a first come first serve basis. I informed that that the enrollment packet of the child they are trying to enroll was still not complete but that I have been waiting to hear back from the State of Alaska Child Care unit because I had reached out to them on the probability of enrolling this particular child even though our license was only for 20 children. I continued to explain that we have a child who is in part time care and another who will be on vacation so I may be able to get approval to allow the child to attend on the days that we will not be full. They were not content with the information I had given them and kept asking to me call the other family and tell them I made a mistake and offered them a spot that was meant for another family. I told them I can't do that. They then said that they will talk to the Health Department Director and asked me if I would call the family if the director told me to. I told them that if the director asked me to do that, I guess I won't have a choice but to follow orders. They left my office. I still followed up with our licensing agent about the possibility of enrolling the foster child. Upon approval, I contacted Rosie Habeich, the director of the health department, to notify her of the situation that occurred that day and for approval to allow the child to attend on the specific days that the infant classroom will not be at capacity. Rosie approved my plan and also informed me that Laura, Vanessa and Chef Welch did not contact her regarding this matter. I was actually the one that reached out to Laura later that evening to inform her that I got the approval to have the foster child enrolled with the condition that that child can only attend on specific days (I gave Laura the days that the child can attend at the center). Laura came back to the center on the morning of September 11 to complete the enrollment packet in my office before leaving the child.

P.S. I did not realize Laura was the foster parent of the child until halfway through my meeting with her, Vanessa and Chef Welch. I assumed her and Chef Welch came to the center with Vanessa as Borough officials.

*Nicole Kimberly Watson*

Child Care Center Site Supervisor
Barrow Early Learning Center
NSB Health Department
(907)852-0340 EXT. 4402
nicole.watson@north-slope.org

Confidentiality Notice: Confidential Health Information May Be Enclosed

*This electronic transmission may contain Protected Health Information (PHI). PHI is individually identifiable information related to the past, present or future physical or mental health or condition of an individual; or the past, present, or future payment for the provision of health care to an individual. To the extent the information in this e-mail contains PHI, it is being transmitted to you after appropriate authorization from the individual or under circumstances that do not require authorization by the individual. You are obligated to maintain PHI in a secure and confidential manner in accordance with applicable law. Re-disclosure of PHI without the individual's authorization or as permitted by law is prohibited. Unauthorized re-disclosure or failure to maintain confidentiality of PHI may subject you to penalties under applicable state and federal laws.*

*IMPORTANT WARNING: This message is intended for the use of the person or entity to which it is addressed and may contain information that is confidential. If you are not the intended recipient or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any disclosure, copying, forwarding or distribution of this information is STRICTLY PROHIBITED. If you have received this electronic message by error, please notify the sender and immediately delete all copies from your computer system to prevent further disclosure.*

# EXHIBIT 5

EXHIBIT 5

**Brian Stibitz**

| | |
|---|---|
| **From:** | Vasha Davis <Vasha.Davis@north-slope.org> |
| **Sent:** | Wednesday, March 7, 2018 11:51 AM |
| **To:** | Felipe J. Farley |
| **Subject:** | BELC incident |

Good morning,

So as you asked here are the events that happened at the Barrow Early Learning Center as I remember them.

I was in my classroom, the toddler room, when I saw a police vehicle pull up to the center and thought that someone from the police department was dropping something off for someone at the Barrow Early Learning Center. Thinking that I could be of assistance I excused myself from the classroom and processed to the front of the building. From the hall way I observed that it was not the police officer that I know but instead a police officer that I never met before who was in full police gear and was being accompanied by a woman that I also did not know. I remember being concerned but I don't think I participated at all in the conversation. I do remember having a conversation with my supervisor, Nicole Watson, after they had left asking what that was all about. She told me that those people were the Police Chief and the Assistant Borough Attorney and they were here trying to get a spot for a child that was being fostered by Assistant Borough Attorney Laura. (This is strictly my observation) Nicole looked shaken up and I asked why Laura had shown up because I knew that Nicole had already to Laura previously that there were no more spots available at that center at that time. I also asked why the Chief of Police was involved and Nicole shook her head at me and told me that she needed to inform her supervisor, Cheryl Humme, about what had happened so I left her office.

That is all I can really remember from the actual day of the event.
P.S I know that the borough has a no retaliation policy but, as I'm sure you know, most people finds ways to retaliate. I'm hoping that we can keep my name out of this as much as possible because it probably wouldn't be a good thing to be on the Chief of Police's bad side.

# Vasha Davis
# Legal Secretary
North Slope Borough Law Department
P.O. Box 69 Barrow, AK 99723
907.852.0300 (Main)
907.852.5678 (Fax)

# EXHIBIT 6

EXHIBIT 6

# North Slope Borough
## Police Department

## M E M O R A N D U M

**TO:**    Acting Chief Jeffrey Brown

**FROM:**    Acting Lieutenant Scott Sharpe

**DATE:**    March 8, 2018

**SUBJECT:**    Case 18000187 - Agency Assist

---

This memorandum is prepared based on my recollection of the facts and circumstances surrounding the initiation of case 18000187 for an agency assist. Some of the minor details are recalled to the best of my ability, given that other than its unusual nature this did not appear to be an activity of any noteworthiness at the time.

On March 2, 2018, I was contacted by Chief Travis Welch regarding a welfare fraud. He informed me that he had received information from an unspecified individual about a welfare fraud where previous foster parent had retained benefits and was not turning them over to a current foster parent and the current parents' request for assistance from WIC was not satisfactory. Chief Welch requested that the information be received, documented, and an agency assist case be taken and forwarded to the State. He said that he had advised the caller to contact me. I advised him to have them contact dispatch. We had not, to my knowledge, taken an agency assist case for welfare fraud previously nor had we been contacted by WIC or any agent from the State of Alaska.

On March 2, 2018, at about 5:16pm, Laura Russell requested a from dispatch police officer in the lobby of the police department regarding a foster child situation. I responded and contacted her in the administrative area, she went into Chief Welch's office and sat in a chair. I interviewed her there, and she provided me information that Jessica Okesene had retained the WIC program benefits for Grace Edwardsen for the months of January, February, and March of 2018 when she had received custody of the child on January 17, 2018. Laura stated she had hoped to get the benefit checks prior to her leaving on a flight on Sunday.

As a result of the Chief's involvement and the hope for the benefits check prior to the departure of the flight, on March 3, 2018, I contacted Jessica at her residence, and requested the benefit checks from her. She stated they were at work and she would get them to me later. Later in the day, I was handed by a patrol officer benefit checks for Grace Edwardsen for February and March 2018. I had the benefit checks on my desk, and informed Chief Welch of the results. He stated he would take the checks to Laura. I, half-jokingly, said that I needed to ensure their return

and needed to do it personally. He said he would see her and could return them, I relented and shortcut the evidence processing procedure and released the benefit checks to him.

On March 7, 2018, I received a call from the WIC office, from Wendy Christian. She thanked me profusely for securing the checks, and asked me to return them to her to be reissued. She was advised they had been released, and she said they would not be useable without being reissued, and that proper protocol would be to return seized benefits to the WIC office.

The usual protocol should be to refer a complainant to Dispatch, to receive an initial complaint. On Dispatch's receipt of an initial complaint, an officer is dispatched to investigate. Based on the investigation, a determination is made as to whether or not our agency has further involvement in a criminal matter or if we can or should refer the complainant to another agency. In this case, I would have ordinarily referred someone to the WIC fraud office as this is outside our jurisdiction and fairly improbable for us to determine whether or not a fraud had occurred. I would have referred a normal person to their website to obtain their contact information, or for a person with a need for additional support (elderly, etc.) I would have researched the number to provide it. Under normal circumstances an agency assist case would not have been initiated nor the information referred on behalf of a foster parent, the complainant should have been WIC or the Office of Children Services for us to initiate a criminal investigation into this matter on behalf of another agency.

The usual protocol on receipt of stolen property is to log the property into evidence, tagged within the system, then have the legal owner of the property come in and sign a receipt for the items' disbursement in a meeting with an evidence technician. This would not have been available until Monday, March 5, 2018. Additional considerations in this instance are who the benefits actually belonged to, the WIC program and the state, Grace Edwardsen to whom they had been issued, to Jessica who had receipt of them at the time of issuance on behalf of Grace, or Laura Russell, the current foster parent for Grace, or the Office of Children's Services and the State of Alaska, the current legal guardian of Grace.

For a reference point on March 7, 2018, I had an interested person in the lobby regarding an insurance fraud that had occurred within the Municipality of Anchorage. He was referred to their jurisdiction and no agency assist case was taken, and his report had a greater chance of involving criminal activity.

At no point did I think we had done anything wrong, just that the request and the procedures followed were unusual and not the typical procedures or advice given in similar circumstances.

According to the <u>Alaska Department of Health and Social Services Fraud Control Division website</u> there may not have been a violation they would have deemed suitable to refer to prosecution due to the dollar amount of the benefit as well as the inarticulate nature of the blatancy of the withholding of the benefits.

> **"*Recipient Fraud Control***
>
> *The Unit investigates allegations of fraud committed by ATAP, Food Stamp and Medicaid benefit recipients. Many fraud cases are resolved through program*

*disqualification penalties and the recovery of the misspent funds. Cases involving high dollar loss or blatant fraud are referred to the Department of Law for criminal prosecution.*

**Fraud Penalties**

*Persons suspected of welfare fraud are presented with the investigation findings and given the option of accepting program disqualification and repaying the debt, or facing an Administrative Disqualification Hearing to determine if fraud occurred. Individuals that intentionally violate program rules are disqualified from the program for a specified time, must pay back benefits and can face time in jail.*

| | | |
|---|---|---|
| **1st Offense** | *ATAP* | *6 month disqualification* |
| **1st Offense** | *Food Stamps* | *12-month disqualification* |
| **2nd Offense** | *ATAP* | *12-month disqualification* |
| **2nd Offense** | *Food Stamps* | *24 months disqualification* |
| **3rd Offense** | *ATAP/Food Stamps* | *Permanent Disqualification* |

**Overpayment Collection**

*The division sets up claims for fraud losses and recovers these debts. The recovery methods include garnishing permanent fund dividends, reduction of current benefits, federal income tax refund interception (food stamps only), garnishing wages and the filing of small claims. "*

# EXHIBIT 7

EXHIBIT 7



**Office of the Governor**

COMMISSION FOR HUMAN RIGHTS

800 A Street, Suite 204
Anchorage, Alaska 99501-3669
Main: 907.274.4692 / 907.276.7474
TTY/TDD: 907.276.3177
Fax: 907.278.8588

March 9, 2018

Law Department
North Slope Borough
P.O. Box 69
Barrow, AK 99723

Re:    *Beth Russell v. The North Slope Borough*
       ASCHR No.:  J-18-044
       EEOC No.:   38A201800087

Dear Sir or Madam:

I am enclosing a copy of a complaint that has been filed with the Alaska State Commission for Human Rights (the Commission). The complaint alleges that you have violated the Alaska Human Rights Law, AS 18.80.010, et seq.

The Commission is the state agency charged with the impartial investigation of discrimination complaints brought under the Alaska Human Rights Law. ***Please note that the law requires that you save all records pertinent to this case.*** This includes email that may be subject to auto-deletion programs. Please take the steps necessary to insure that all email relevant to this case is retained until final disposition of this complaint.

You are encouraged, but not required, to promptly submit a response to the complaint's allegations and attach documents you believe are relevant to the case. In your response, please provide the name and title of the individual whom Commission staff should contact during the investigation. Please direct your response and any questions you may have about this case to me. My telephone number is 792-7226. I will be writing to you soon with the name of the investigator who will work on the case.

Sincerely,

Matthew J. Jendrusina
Investigations Director

MJJ/oll

Enclosures:    Complaint of Discrimination
               Authorization to Release Information



# ALASKA STATE COMMISSION FOR HUMAN RIGHTS

RE: *Beth Russell v. The North Slope Borough*

ASCHR NO. ___J-18-044___

## AUTHORIZATION TO RELEASE INFORMATION

I, Beth Russell, hereby authorize and direct any and all agencies to release to the Alaska State Commission for Human Rights any documents pertaining to me, relevant to the investigation of the complaint.

This authorization includes examination and copying of documents, including but not limited to any and all personnel records, performance evaluations, financial records, applications, medical records, hospital records, all tests of any type, diagnosis, prognosis, etc. I further authorize and direct the above-named party(s) to furnish oral reports to the Alaska State Commission for Human Rights as may be requested.

_____
Complainant

03/07/18
Date

# ALASKA STATE COMMISSION FOR HUMAN RIGHTS

***COMPLAINT OF DISCRIMINATION***

| | |
|---|---|
| **COMPLAINANT:** | *Beth Russell* |
| ADDRESS: | PO Box 1804, Barrow, AK 99723 |
| TELEPHONE: | (434) 882-0828 |

| | |
|---|---|
| **RESPONDENT:** | *The North Slope Borough* |
| ADDRESS: | PO Box 69, Barrow, AK 99723 |
| TELEPHONE: | (907) 852-2611 |

I would also like this complaint filed with EEOC.

***DATE OF MOST RECENT OR CONTINUING DISCRIMINATION:*** *March 7, 2018 and continuing*

***RESPONDENT EMPLOYS:*** 15 or more

I applied for respondent's multiple open positions, and as of March 7, 2018, they remain open.

I allege that respondent has discriminated against me on the basis of my race, Caucasian, in violation of AS 18.80.220, Title VII of the Civil Rights Act of 1964, as amended, for the following reasons:

1. On December 14, 2017, I applied and was subsequently interviewed for one of respondent's three open dispatch positions, a position for which I am qualified. On February 8, 2018, I was informed that a lesser qualified candidate not of my race was selected and respondent continued to seek additional applicants for the remaining positions. As of March 7, 2018, respondent's dispatch positions remain open and its interviewed additional applicants.

2. On February 9, 2018, I applied and was subsequently interviewed for one of respondent's two open administrative positions, a position for which I am qualified. On March 2, 2018, I learned respondent's Director of Human Resources returned my hiring packet to respondent, refusing to accept my application based on my race.

I pledge to inform the Human Rights Commission and any other agency listed above of any change in my address or telephone number and will cooperate fully with them in the proceeding of this complaint.

| | |
|---|---|
| I swear or affirm that I have read the above complaint and that it is true to the best of my knowledge, information and belief: | If no notary public is available, please certify below: |
| *Beth Russell*     03/07/18 | A notary public or other official empowered to administer oaths is not available. Therefore, I swear and certify under penalty of perjury that the above complaint is true to the best of my knowledge, information and belief |
| SIGNATURE OF COMPLAINANT    DATE | |
| Subscribed and sworn to me this 7 day of March 2018 at Anchorage AK | STATE OF ALASKA NOTARY PUBLIC |
| *Breanna Lee* | SIGNATURE OF COMPLAINANT    DATE |
| SIGNATURE OF NOTARY PUBLIC or POSTMASTER | Breanna Lee |
| My commission expires with office | PLACE (City, Town, or Village and State) |
| | My Commission Expire With Office |

# EXHIBIT 8

EXHIBIT 8

**NORTH SLOPE BOROUGH**
**POLICE DEPARTMENT**
P.O. Box 470
Utqiaġvik, Alaska 99723
Phone: 907-852-0311
Fax: 907-852-0318



Jeff Brown, acting Chief of Police

MEMORADUM

To:     Jeff Brown, acting Chief of Police

From:  Belinda Glastetter, Police Dispatch Supervisor

Date:  03/08/2018

Re:     Hiring packet 13-17-018 / Applicant Beth Russell

I have been asked to document my interaction with then Chief Travis Welch in regards to applicants for the above referenced job opening in which I am the hiring manager. We had over 50 applicants and prior to beginning the interview process the chief approached me to acknowledge the great pool we had and mentioned Beth Russell as being a great candidate (if I remember correctly he also mentioned other candidates as well). I do not remember the exact verbiage he used nor do I remember the date. Whether he meant to or not, I do remember feeling like I had better at least interview her even though I hadn't had a chance to review applications. I did add her to the list of applicants to interview as her application did show a Barrow residence. I also expressed my concern with Jeff Brown, acting Deputy Police chief and Darrel Love, Support Services Manager regarding the chief and my annoyance that he would put me in that position. I believe I was able to put my concern aside and proceed with interviews giving each candidate an unbiased interview based on their answers to questions and other qualifications, i.e. typing test, criminal background clearance etc. I do believe Beth would be an asset to the community in this position and that that ultimately the chief was correct in that she is in fact a great candidate, based on the interview process.

# EXHIBIT 9

EXHIBIT 9



Laura Russell
to Felipe, deano, olemaun, harry.brower, ...
Yesterday View details

Good afternoon,

I have attempted multiple times to speak with Ken Robbins about these issues but he refused to talk to me on a timely basis, and because of that I had to turn to other avenues for relief.

This email is to notify you that I have spoken with the Human Rights Commission regarding workplace discrimination and retaliation and they are working with me on this complaint.

I will also be contacting the EEOC regarding these issues.

Please note that under NSBMC 2.20.420 and PRR Chapter 5.03 (Whistleblower Act), the NSB may not take action against me for reporting a matter of public concern to a public body. This includes discharge or removing any privileges of employment.

Also note that Mayoral Appointees may not be discharged for discriminatory or retaliatory reasons. To take any adverse action against me would violate State, Federal, and local law.

I have also notified the Commission that Director Leavitt has illegally discriminated and retaliated in the hiring processes involving my sister Beth Russell (who has interviewed with both NSBPD and A&F). Please note that I have not participated in those hiring processes due to my relationship with her.

Laura Russell
(434) 862-0380 (cell)
Laura.r.Russell@gmail.com

# EXHIBIT 10

EXHIBIT 10



○ Live        Photo        ○ Check In

 **Laura O'neil Russell** added 2 new photos.
17 mins · Anchorage · 👥

Today, for the first time in my life, I was fired.
The reason? I refused to endorse discriminatory practices, I refused to help cover up a terrible crime, and then I committed the ultimate sin of reporting sexual harassment and gender discrimination.
Within a few hours of me notifying them that I had filed a complaint, the Mayor's office cut off all my access to the server. They then waited until I was in a public place today, in a conference with industry leaders, to publicly serve me with this termination.

I am not ashamed. I am proud that I did the right thing even at the cost of my livelihood. But I am very sad. And also very unemployed. So if any of you know of good jobs for me to apply to, please let me know. I need to be able to support my foster baby who I love so much.



# EXHIBIT 11

**EXHIBIT 11**

# Law Office of Sara L. Bloom

E-mail: Sara@907lawyer.com

Attorney and Counselor at Law
1120 Huffman Rd.
Ste 24-785
Anchorage, AK 99515

Phone:       (907)519-3613
Facsimile: (907)563-2276

April 13, 2018

Harry K. Brower, Jr., Mayor
Mayor's Office
P.O. Box 69
1274 Agvik Street
Utquagvik, AK. 99723

Felipe Farley
North Slope Borough Attorney
Law Department
P.O. Box 69
Utqiagvik, AK 99723

Sent via first class mail and by email to lucia.johnston@north-slope.org and
felipe.farley@north-slope.org

Re: Wrongful Termination of Laura Russell

Dear Mayor and Mr. Farley:

Please be advised that I have been retained by Laura O. Russell to address the Borough's
past and ongoing defamatory and retaliatory actions. This letter is sent to address these
actions. We demand that the Borough and its representatives immediately cease such
actions and further demand that the Borough return Ms. Russell's belongings and
compensate her for the damages that they caused.

On March 7, 2018, the Borough illegally terminated Ms. Russell's employment when it
retaliated against her for complaining of workplace discrimination, harassment, and
retaliation in violation of AS18.80.220 and Title VII. During her employment, Ms.
Russell was subjected to a hostile work environment and sex and race discrimination,
including sexual harassment. Even after termination, Ms. Russell is continually subjected
to retaliation, harassment, and defamation from the Borough and its representatives.

Information and evidence show that the Mayor's Office, as well as the Law Office, have
engaged in active efforts to defame Ms. Russell and attack her personal and professional

Letter to Mayor and Felipe Farley
Page 1 of 6
Case 3:20-cv-00058-RRB   Document 13   Filed 09/14/20   Page 48 of 52

reputation. These actions include, but are not limited to: attempting to convince the Native Village of Barrow that Ms. Russell is an unfit foster parent and that her foster child be taken away from her; instituting a "gag order" by informing current Borough employees (including those in the classified service) that there will be negative employment consequences for anyone interacting with, helping, or speaking with Ms. Russell; promulgating false and defamatory rumors that Ms. Russell is promiscuous in her behavior and has engaged in sexual liaisons with various male Borough employees; spreading false allegations of workplace misconduct by both implying and stating that Ms. Russell has been under investigation for a supposed incident at BELC in September 2017; spreading false allegations that Ms. Russell was terminated at least in part for this; and spreading false allegations that Ms. Russell was terminated for engaging in sexual affairs.

In addition, the Borough has engaged in extreme and reprehensible acts of harassment and retaliation since terminating Ms. Russell's employment. Unlike its treatment of other employees, and without any legal justification, the Borough claims to have banned Ms. Russell from government property and has physically prevented her from peacefully collecting her belongings. In fact, as of the date of this letter, Ms. Russell has not received all of her personal items. The Borough has, without consent and legal justification, searched Ms. Russell's private possessions; attempted to or actually prevented her from receiving police help on multiple matters; and refused to issue and allow pick-up of Ms. Russell's final check in the timeline dictated by NSB Code and regulations.

As the Law Department well knows and has enforced in prior employment releases, the lump sum value of leave must be issued to the former employee *within* three (3) days of termination. For no apparent reason, the Borough mailed her final check rather than direct depositing it, causing a delay in payment. Furthermore, the check and the leave value check were not mailed until on or after March 14 and 15 and were not received at the post office until March 21. Ms. Russell, not notified of any of this, and not permitted to pick up her checks in person, did not receive the funds to which she was entitled until after March 21.

Ms. Russell is entitled to pay at her regular rate for each day on and after March 13 until actual receipt of the checks.

Ms. Russell demands within the next ten (10) days an immediate return of all of her belongings, including but not limited to the personal paperwork in her office (including records of her travel, CLE records, etc.). They can be sent to Laura Russell, P.O. Box 1804, Utqiagvik,, AK. 99723.

Ms. Russell further demands an itemized statement of each document or item that the Borough has chosen to withhold as well as an accounting of exactly what actions were

Letter to Mayor and Felipe Farley
Page 23 of 5
Case 3:20-cv-00058-RRB   Document 1   Filed 09/14/20   Page 49 of 52

taken when it chose to review all of her personal electronic files, including whether any documents were deleted, moved, or modified. This list should include which individuals had access to and were involved in reviewing and moving Ms. Russell's belongings and documents. This list should include which documents were opened and read. You can email this list to me, and I would expect it within ten (10) days from the date of this letter.

Ms. Russell demands that the Borough and its representatives immediately cease and desist from making defamatory statements and implications, attacks on Ms. Russell's reputation, orders to employees not to interact with Ms. Russell, orders to bar Ms. Russell from the rights and privileges to which she is entitled as a citizen of the Borough, and actions to block Ms. Russell from obtaining future employment at the Borough.

Specific individuals known to have engaged in defamatory, retaliatory, and harassing behavior towards and about Ms. Russell include, but are not limited to:

- Vasha Davis (Law Department)
- Lieanne Amante (Law Department)
- Kevin Fischer (Law Department)
- Felipe Farley, Borough Attorney (Law Department)
- Lucy Leavitt, Director of Human Resources
- Leanna Mack (Mayor's Office)
- CAO Forrest "Deano" Olemaun (Mayor's Office)
- Kenneth Robbins (Advisor to the Mayor)
- Mary Vaitohi (Employee at BELC)
- "Rosie" Habeich, Health Department Director
- April Brower, Search and Rescue Director
- Shannon Esparza, Assistant to Chief (Police Department)
- Scott Danner, Director of Public Works
- Jeff Brown, Acting Police Chief

As a result of the harm caused to Ms. Russell, Ms. Russell seeks compensation for retaliatory discharge, intentional infliction of emotional distress, and defamation. Ms. Russell left a highly paid, well-regarded position with the State of Alaska, in which she was rapidly advancing, in order to accept the Borough's offer of employment and intended to stay in this position until retirement. We believe that a fair settlement is as follows:

1. NSB will agree to provide affirmatively positive performance reviews whenever contacted regarding Ms. Russell's employment with the Borough.

2. NSB will admit that Ms. Russell was released due to no fault of her own and that

Letter to Mayor and Felipe Farley
Page 23 of 5
Case 3:20-cv-00058-RRB   Document 1   Filed 09/14/20   Page 50 of 52

there were no performance issues leading to her termination.

3. Wages in an amount equal to the years she would have remained at NSB to vest at **20 years**. These wages must include expected yearly increases and COLA increases. Ms. Russell's yearly income was $145,000.

4. PERS contribution and vesting for that time period.

5. Cash value of leave that would have been accrued during that time period, including the increases in leave time that are granted based on the duration of employment (e.g., 6, 8, 10 weeks).

6. Cash value of benefits for that time period and including the time period from termination to settlement.

7. Actual costs of relocation, travel, and job seeking between termination and settlement.

8. Cash value of leave taken during Ms. Russell's employment due to the stress of hostile work environment, sexual harassment, and discriminatory and retaliatory actions.

9. Reimbursement for personal items damaged through NSB's insistence on packing and mailing Ms. Russell's items rather than letting her pick them up.

This offer encompasses only actual and expected actual monetary amounts. Should the Borough decline this offer or fail to make an acceptable counter-offer, Ms. Russell may seek judgment on Discrimination/Hostile Work Environment, Retaliatory Discharge, Breach of Good Faith and Fair Dealing, Intentional Infliction of Emotional Distress, Defamation, and Slander. Additionally, punitive damages will be sought, and each NSB representative involved will be sued in their individual capacity.

As a reminder, should these proceedings be held in an administrative setting or court of law, under Alaska Rule of Professional Conduct 1.6(b)(5)-(6):

**A lawyer may reveal a client's confidence or secret** to the extent the lawyer reasonably believes necessary...to establish a claim or defense on behalf of the lawyer in a controversy between the lawyer and the client, to establish a defense to a criminal charge or civil claim against the lawyer based upon conduct in which the client was involved, or to respond to allegations in any proceeding concerning the lawyer's representation of the client; or...to comply with other law or a court order.

Please respond to this letter by April 20th. This response should include the itemization

Letter to Mayor and Felipe Farley

described above.

Thank you for your attention to this matter, and I look forward to speaking with you.

Sincerely,

Sara Bloom

cc: Laura Russell